Christopher A. Seeger
Christopher L. Ayers
**SEEGER WEISS, LLP**
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
Telephone (973) 639-9100
cseeger@seegerweiss.com
cayers@seegerweiss.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **GLENN LATIMER** *individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>**HEALTHEC, LLC**<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Glenn Latimer. ("Plaintiff") brings this Class Action Complaint, individually and on behalf of all others similarly situated (the "Class Members"), against Defendant HealthEC, LLC ("HealthEC" or "Defendant") and alleges as follows, based upon information and belief, investigation of Counsel, and the personal knowledge of Plaintiff.

### NATURE OF CASE

1.      This class action lawsuit arises from a significant data breach at HealthEC, a population health technology company. Between July 14, 2023, and July 23, 2023, cybercriminals compromised HealthEC's network, leading to unauthorized access and exfiltration of highly

sensitive personal information of over 4.5 million individuals.[1] This breach included the loss of control over personally identifiable information ("PII") and private health information ("PHI"), collectively referred to as "Private Information."

2.      Defendant HealthEC, known for providing services to health systems and care organizations, failed to safeguard the Private Information of both direct and indirect consumers, including those who never had a relationship with or consented to HealthEC's data practices.  The breached data encompassed a wide array of personal details, including names, addresses, dates of birth, Social Security numbers, Medical Record numbers, medical information (including but not limited to diagnosis, diagnosis code, mental/physical condition, prescription information, and provider's name and location), health insurance information (including but not limited to beneficiary number, subscriber number, and Medicaid/Medicare identification), and billing or claims information (including but not limited to patient account number, patient identification number, and treatment cost information).[2]

3.      Defendant owed a non-delegable duty of care to protect this Private Information. Despite assurances of stringent security measures, Defendant's failure to implement adequate cybersecurity protocols made the data vulnerable to cyberattacks.  This negligence led to the Data Breach, which remained undetected for a significant period, allowing cybercriminals unfettered access to this sensitive data.

4.      The Data Breach at HealthEC, a glaring example of inadequate data security, highlights significant lapses in digital information protection.  Defendant maintained a repository

---

[1] *See* HealthEC, *Notice of HealthEC LLC Cyber Security Event* (Dec. 22, 2023), https://www.healthec.com/cyber-incident/
[2] *see id.*

of sensitive data, including PII and PHI, on computer systems that were insufficiently secured against cyber threats.

5.      Defendant's approach to data security was fundamentally flawed, characterized by outdated and inadequate cybersecurity measures.  These deficiencies allowed cybercriminals to bypass security protocols with relative ease.  Upon information and belief, it is alleged that Defendant was aware, or should have been aware, of the vulnerabilities in its systems, yet failed to take appropriate steps to enhance their security infrastructure.  This failure to act upon known risks constitutes a severe neglect of their duty to protect sensitive consumer data.

6.      Instead of being a fortress safeguarding consumer information, Defendant's data systems were more akin to a porous structure, easily penetrable by those with malicious intent. The lack of robust encryption, inadequate network monitoring, and failure to implement industry-standard cybersecurity practices made the Defendant's data systems a target for cybercriminals.

7.      Defendant's delayed response and inadequate breach notification further compounded the impact of the Data Breach.  The notification, issued months after the initial breach discovery, was vague and lacked critical details about the extent and nature of the breach, leaving victims uninformed about the specific risks they faced.

8.      As a direct consequence of the Data Breach, Plaintiff and Class Members are now at a heightened risk of identity theft and fraud.  The compromised information, particularly sensitive to identity thieves, exposes them to various potential crimes, including financial fraud, medical service theft, government benefits fraud, and other forms of exploitation.

9.      Plaintiff seeks to ensure that Defendant takes responsibility for the breach and implements robust security measures to safeguard sensitive data in the future, including mandatory audits and comprehensive credit monitoring services for the affected individuals.

10. Plaintiff, on behalf of himself and the proposed Class Members, seeks legal redress for the Defendant's negligence, breach of implied contract, and unjust enrichment. The lawsuit aims to secure compensatory damages, injunctive relief, and other equitable remedies to improve Defendant's data security practices and prevent future breaches.

11. Plaintiff asserts these claims under the Federal Rules of Civil Procedure 23, representing all affected individuals. This action aims to hold Defendant accountable for their inadequate data protection measures and failure to provide timely and accurate information post-breach.

## THE PARTIES

12. Plaintiff Glenn Latimer is a natural person, resident, and citizen of Illinois, residing in Cook County.

13. Plaintiff received a notice letter dated December 22, 2023, from Defendant HealthEC, stating that an unauthorized party accessed his Private Information.

14. Defendant HealthEC, LLC is a limited liability company organized under the laws of the state of Delaware, with its principal place of business located at 343 Thornall Street, Suite 630, Edison, New Jersey 08837.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists as Defendant are citizens of States different from that of at least one Class member.

16. This Court has personal jurisdiction over Defendant because Defendant operates in and direct commerce at this District.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant Health EC's principal place of business is located in this District, a substantial part of the events giving rise to this action occurred in this District, and Defendant has harmed Class Members residing in this District.

## FACTUAL ALLEGATIONS

### DEFENDANT'S BUSINESS

18.     Defendant HealthEC, a key player in health technology, specializes in providing healthcare-focused services to various entities, including healthcare providers and organizations. HealthEC has developed a sophisticated platform used by over one million healthcare professionals across 18 states. This platform is instrumental in "identifying high-risk patients, closing care gaps, and recognizing barriers to optimal care."[3]

19.     HealthEC generates approximately $23 million in annual revenue in its operations, boasting itself as a modern, AI-enabled population health management platform. This platform integrates clinical with claims data to create comprehensive patient community health records.[4]

20.     HeathEC requires that its customers and clients entrust it with highly sensitive personal information. As a core part of its service delivery, HealthEC gains access to a wide array of patient data its healthcare provider customers provide.

21.     On information and belief, this data includes personal identifiers such as names, dates of birth, addresses, Social Security numbers, medical record numbers, medical histories, treatment and diagnosis information, diagnostic codes, mental/physical conditions prescription

---

[3] *See*  https://www.healthec.com/ (last accessed Jan. 19. 2024).
[4] *see id.*

details, provider information, health insurance data, beneficiary information, billing, claims, and treatment cost information.

22.     Indeed, HealthEC's entire business depends on consumers entrusting it with Private Information.  Without this Private Information, HeathEC would not be able to perform services.  HealthEC's "AI-enabled solution ingests all available data — integrating clinical with claims data to create a community health record for each patient."[5]

23.     Defendant collects and maintains a broad spectrum of private information in its business operations.  This includes not only the typical demographic and contact details but also extends to financial and payment information, health billing details, individual medical history, medication information, and other health-related data.

24.     Moreover, Defendant receives and stores private information from various sources within a patient's "circle of care." This includes data from referring physicians, other doctors, health plans, and even close friends or family members involved in the patient's care.

25.     Due to the highly sensitive and personal nature of the consumer data that Defendant collects, stores, and maintains, HealthEC's privacy policy assures consumers that HeathEC  "is committed to protecting the privacy of the personally identifiable information that we collect."[6]

26.     HealthEC further guarantees that  HealthEC "has implemented generally accepted standards of technology and operational security in order to protect Personal Info from loss, misuse, alteration, or destruction."[7]

27.     Defendant, being a HIPAA-covered entity, is mandated to implement adequate safeguards to prevent unauthorized use or disclosure of private information.  This includes

---

[5] *see id.*
[6] *See* HealthEC, *Privacy Policy*, https://mneconnect.healthec.com/ProdMNeConnectAdmin/Privacy_Policy.aspx
[7] *See* HealthEC, *Privacy Policy*, https://mneconnect.healthec.com/ProdMNeConnectAdmin/Privacy_Policy.aspx

complying with the HIPAA Security Rule and reporting any unauthorized use or disclosure, including breaches of unsecured PHI.

28.    Defendant accepted legal and equitable duties by acquiring, gathering, utilizing, and gaining advantage from the Plaintiff's and Class Members' Private Information. Defendant knew or should have known that it was responsible for protecting Plaintiff's and Class Members' Sensitive Information against any unauthorized release.

29.    Despite these obligations and their self-proclaimed high standards for data security, Defendant failed to maintain sufficient security to protect their systems from cyberattacks. This failure led to a substantial Data Breach, affecting nearly 4.5 million individuals, including the Plaintiff and Class Members. The delay in public disclosure of the breach further exemplified the inadequacies in Defendant's data security measures and response protocols.

**DEFENDANT IS A COVERED ENTITY UNDER HIPAA**

30.    As a HIPAA-covered entity, Defendant provides services to millions of patients annually through their hospital and medical practice clients. In the regular conduct of their business, Defendant collects highly sensitive Private Information of these patients. Being a covered entity, Defendant is obligated under both federal and state law to uphold the strictest levels of confidentiality concerning the Private Information they acquire, receive, collect, and store. Additionally, Defendant is mandated to implement robust safeguards to prevent unauthorized third-party access to this Private Information.

31.    Given the nature of Defendant's operations, which encompass a variety of services to healthcare clients including the management of electronic health records, it is essential for them to collect and aggregate Private Information. Defendant recognizes this information as sensitive and confidential, integral to their regular business activities.

32.     Defendant assumed critical legal and equitable duties through the acquisition, collection, use, and benefit derived from Plaintiff's and Class Members' Private Information.  It was incumbent upon Defendant to know, or they should have known, its responsibility in protecting Plaintiff's and Class Members' Private Information from unauthorized disclosure.

33.     Plaintiff and Class Members, comprising patients or their executors/surviving spouses, had their Private Information maintained by Defendant.  This information was entrusted, directly or indirectly, to the Defendant.  Plaintiff and Class Members depended on Defendant to enforce and adhere to adequate data security policies and protocols, ensuring the confidentiality and secure maintenance of their Private Information, using it solely for business and healthcare purposes, and preventing any unauthorized disclosures.

34.     HealthEC, as a covered entity under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), is mandated to comply with the HIPAA Privacy Rule and Security Rule, as outlined in 45 C.F.R Part 160 and Part 164, Subparts A and E, and Subparts A and C respectively.  These rules set national standards for the protection of patient information, including protected health information (PHI), defined as "individually identifiable health information."

35.     HIPAA restricts the permissible uses of PHI and strictly prohibits its unauthorized disclosure.  It also requires entities like HealthEC to implement appropriate safeguards for the protection of such information.

36.     Despite these requirements, as detailed in this Complaint, Defendant failed to reasonably protect, secure, or store Plaintiff's and Class Members' Private Information prior to, during, and after the Data Breach.  They enacted inadequate data security measures, which they

knew or should have known were insufficient, leading to a significant data breach as cybercriminals bypassed their security measures.

## THE DATA BREACH AND NOTICE LETTER

37.      On an unknown date, HeathEC became aware of suspicious activity affecting its network and systems.  Upon detecting this suspicious activity on their network, HealthEC initiated a forensic investigation. [8]

38.      Following the investigation,  HeathEC issued a notice on its website and a letter addressed to Plaintiff on December 22, 2023 ("Data Breach Notice").[9] According to the Data Breach Notice, HeathEC learned in its investigation that unauthorized parties accessed certain systems between July 14, 2023, and July 23, 2023.[10] After obtaining access, the unauthorized parties copied certain files.[11]

39.      HeathEC confirmed that the exfiltrated information included names, addresses, dates of birth, Social Security numbers, Taxpayer Identification numbers, Medical Record numbers, Medical information (including but not limited to Diagnoses, Diagnosis Codes, Mental/Physical Conditions, Prescription information, and provider's name and location), Health insurance information (including but not limited to beneficiary number, subscriber number, Medicaid/Medicare identification), and/or Billing and Claims information (including but not limited to patient account number, patient identification number, and treatment cost information."[12]

---

[8] *See* HealthEC, *Notice of HealthEC LLC Cyber Security Event* (Dec. 22, 2023), https://www.healthec.com/cyber-incident/
[9] *see id.*
[10] *see id.*
[11] *see id.*
[12] *see id.*

40.     Despite occurring between July 14, 2023, and July 23, 2023, HealthEC delayed notifying its clients that unauthorized parties accessed their Private Information on October 26, 2023, three months after the cybersecurity attack.  HeathEC waited more than five months to mail notice letters to impacted individuals—indicating a significant delay in breach notification.[13]

41.     HealthEC notified the U.S. Department of Health and Human Services Office for Civil Rights of the breach on December 21, 2023.[14] According to the Report, an estimated 4,452,782 individuals were affected by the Data Breach.[15]

42.     The compromised data included Private Information that was accessible and unencrypted, leaving it unprotected and susceptible to being acquired and/or extracted by the unauthorized party.

43.     The targeted cyberattack was designed to access and exfiltrate private and confidential data, including patients' Private Information.  Despite the known risks and their obligations under HIPAA, FTC Act, state and federal law, common law, and industry standards contract, industry standards, and common law, HealthEC failed to adequately safeguard this information.

44.     Plaintiff and Class Members entrusted their Private Information to HealthEC, expecting that HealthEC would comply with its obligation and be kept confidential and secure from unauthorized access.  However, the data breach and HealthEC's delayed response have exposed Plaintiff and Class Members to ongoing fraud and identity theft risks.

---

[13] HIPAA journal, https://www.hipaajournal.com/healthec-data-breach/ (last visited Jan 18, 2024).
[14]   U.S.   Department   of   Health   and   Human   Services   Office   for   Civil   Rights   Report, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Jan 4, 2024).
[15] *see id.*

## THE DATA BREACH WAS A FORESEEABLE RISK

45.     As an entity covered by HIPAA and involved in handling medical patient data, Defendant was at a heightened risk due to the significant rise in cyberattacks and data breaches targeting the healthcare industry.  This risk was well-known and had escalated in the years leading up to the Data Breach, particularly in sectors handling substantial volumes of PII and PHI.

46.     HealthEC should have been aware that the Personal Information of Plaintiff and Class Members was a prime target for malicious actors.  Despite this awareness, they failed to establish and uphold adequate data privacy and security measures to shield this information from foreseeable cyberattacks.

47.     The increased vulnerability of healthcare data to cyberattacks has been a known industry concern for over a decade.  As early as 2011, the FBI had issued warnings regarding the advancement of cybercriminals' abilities to remotely attack systems, particularly those in healthcare, and exploit them to obtain PII.  This warning was not only a prediction of the escalation of cybercrime but also a clear indication to entities like HealthEC of the impending risks associated with the storage and handling of sensitive medical data.[16]

48.     As early as 2014, the FBI alerted the healthcare industry that they were an increasingly preferred target of threat actors, stating "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining Protected Health Information (PHI) and/or Personally Identifiable Information (PII)" so that these companies can take the necessary precautions to thwart such attacks.

---

[16] Gordon M. Snow, *Statement before the House Financial Service  Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

49.     In addition to these industry-specific warnings, general trends in cybercrime have shown an alarming increase in the frequency and sophistication of attacks.  These attacks include American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that their electronic records would be targeted by cybercriminals.

50.     Indeed, in the first ten months of 2023, more than 88 million individual—one quarter of Americans—had their medical data exposed.[17]

51.     The American Medical Association (AMA) has also emphasized the significance of cybersecurity in healthcare, noting it as a technical concern and a vital aspect of patient safety. Research by the AMA reveals that 83% of physicians are part of practices that have been affected by cyberattacks.[18]

52.     Upon information and belief, the nature of the Data Breach was a ransomware attack.

53.     According to the U.S. Department of Health and Human Services Office for Civil Rights,  In the past four years there has been a 239% increase in large breaches reported to OCR involving hacking and a 278% increase in ransomware. [19]

---

[17] HHS' Office for Civil Rights, *HHS' Office for Civil Rights Settles Ransomware Cyber-Attack Investigation* (Oct. 31 2023)          https://www.hhs.gov/about/news/2023/10/31/hhs-office-civil-rights-settles-ransomware-cyber-attack-investigation.html (Last accessed Jan. 19, 2023)
[18] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*,  AM. MED. ASS'N (Oct. 4, 2019),  https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.
[19] *see id.*

54.     Defendant was responsible for complying with HIPAA regulations and adhering to broader industry standards and common law obligations regarding data security.  The continual increase in data breaches within the healthcare sector underscored the necessity for Defendant to implement advanced security measures, such as robust encryption, regular security audits, and comprehensive employee training on cybersecurity.

55.     The specific nature of the Data Breach at HealthEC involved unauthorized access and copying of files containing sensitive patient information.  This attack was part of a broader pattern where healthcare organizations are targeted due to the valuable and detailed personal data they possess.  Such data, when stolen, can be packaged and sold for profit on dark websites, leading to severe privacy invasions and identity theft risks for the affected individuals.

56.     As a HIPAA-covered entity, Defendant should have known about their data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in their unprotected files.

## PERSONAL INFORMATION IS HIGHLY VALUABLE

57.     Defendant knew or should have been aware that it was collecting highly valuable data, for which Defendant knew or should have known there has been an upward trend in data breaches in recent years.[20]

58.     The Federal Trade Commission ("FTC") defines identity theft as "fraud committed or attempted using the identifying information of another person without authority."[21] The FTC describes "identifying information" as "any name or number that may be used, alone or in

---

[20] Healthcare Data Breach Statistics, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (last visited Jan. 19, 2024) ("Our healthcare data breach statistics clearly show there has been an upward trend in data breaches over the past 10 years.").
[21] 17 C.F.R. § 248.201 (2013).

conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[22]

59.      Healthcare data is especially valuable on the black market.  According to one report, a healthcare data record may be valued at up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[23]

60.      According to a Reuters investigation that included interviews with nearly a dozen healthcare executives, cybersecurity investigators, and fraud experts, medical data for sale on underground markets "includes names, birth dates, policy numbers, diagnosis codes and billing information" which fraudsters commonly use "to create fake IDs to buy medical equipment or drugs that can be resold, or they combine a patient number with a false provider number and file made-up claims with insurers.[24]

61.      As noted by Paul Nadrag, a software developer for medical device integration and data technology company Capsule Technologies: "The reason for this price discrepancy—like any other good or service—is perceived value.  While a credit card number is easily canceled, medical records contain a treasure trove of unalterable data points, such as a patient's medical and behavioral health history and demographics, as well as their health insurance and contact information.  Once records are stolen, cybercriminals often tap into members of a criminal network on the dark web experienced in drug trafficking and money laundering who are eager to buy

---

[22] *Id.*
[23] Hackers, Breaches, and the Value of Healthcare Data (Feb. 2, 2022), https://www.securelink.com/blog/healthcare-data-new-prize-hackers/ (last visited Jan. 19, 2025 ).
[24]      https://www.reuters.com/article/us-cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last visited Jan. 19, 2023).

medical records to support their criminal activities, such as illegally obtaining prescription medications, filing bogus medical claims or simply stealing the patient's identity to open credit cards and fraudulent loans."[25]

## DEFENDANT FAILED TO COMPLY WITH HIPAA OBLIGATIONS

62.    HealthEC Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), see 45 C.F.R. § 160.102, and as such is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E  ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule  ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

63.    These rules establish national standards for the protection of patient information, including protected health information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider.  *See* 45 C.F.R. § 160.103.

64.    HIPAA requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.  Covered entities must also implement safeguards to ensure the confidentiality, integrity, and availability of PHI.  Safeguards must include physical, technical, and administrative components.

---

[25] *Industry Voices—Forget credit card numbers. Medical records are the hottest items on the dark web* (Jan. 26, 2021), https://www.fiercehealthcare.com/hospitals/industry-voices-forget-credit-card-numbers-medical-records-are-hottest-items-dark-web (last visited Jan. 19, 2022).

65.     Title II of HIPAA contains what are known as the Administrative Simplification provisions. 42 U.S.C. §§ 1301, et seq. These provisions require, among other things, that HHS create rules to streamline the standards for handling PII like the data Defendant left unguarded. HHS subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA.  These rules include 45 C.F.R. § 164.306 (a)(1-4); 45 C.F.R. § 164.312 (a)(1); 45 C.F.R. § 164.308(a)(1)(i); 45 C.F.R. § 164.308 (a)(1)(ii)(D), and 45 C.F.R. § 164.530(b).

66.     Defendant failed to maintain the privacy and security of their patients' PHI and failed to inform patients that their Personal Information was disclosed.  Upon information and belief, Defendant violated HIPAA by failing to

a.     Maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b.     Adequately protect Plaintiff' and the Class Members' Personal Information;

c.     Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d.     Implement technical policies and procedures for electronic information systems that maintain electronically protected health information to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e.      Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f.      Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g.      Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3).

h.      Train all members of their workforces effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of protected health information, in violation of 45 C.F.R. § 164.530(b).

i.      Failing to render the electronic PHI they maintained unusable, unreadable, or indecipherable to unauthorized individuals, as they had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304's definition of "encryption").

67.    The Data Breach resulted from a combination of insufficiencies that demonstrate Defendant failed to comply with safeguards mandated by HIPAA regulations.

## DEFENDANT FAILED TO COMPLY WITH FTC GUIDELINES

68.     The Federal Trade Commission ("FTC") has issued several business guidelines emphasizing the critical importance of incorporating reasonable data security practices into all business operations.  These guidelines are designed to help businesses understand and fulfill their responsibility to protect customer data.[26]

69.     In a significant update in 2016, the FTC published "Protecting Personal Information: A Guide for Business," setting forth cybersecurity guidelines for businesses.  These guidelines outline essential practices such as (a)protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems.  The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.[27]

70.     The FTC's guidelines also advise businesses, particularly in healthcare, to not retain Personal Identifiable Information (PII) and Protected Health Information (PHI) longer than necessary, to restrict access to sensitive data, enforce the use of complex passwords, adopt industry-tested security methods, monitor networks for suspicious activity, and ensure that third-party service providers implement adequate security measures.[28]

---

[26]     FTC, *Start With Security: A Guide For Businesses*, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf     (last visited Mar. 21, 2022).
[27] *see id.*
[28] see id.

71.    The FTC has taken enforcement actions against businesses, including healthcare providers and their associates, for failing to protect customer data adequately.  These actions are treated as unfair acts or practices under Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.[29]

72.     HeathEC was required to implement fundamental data security practices in line with FTC guidelines.  Their failure to do so, particularly in safeguarding against unauthorized access to patients' PII and PHI, is considered an unfair practice under the Section 5 of the FTC Act, 15 U.S.C. § 45.

73.    Defendant was fully aware of their obligations to protect sensitive patient data and the severe consequences of failing to meet these obligations.  Despite this knowledge, Defendant did not take the necessary steps to comply with the FTC guidelines, leaving patient data vulnerable and exposed.

74.    By neglecting to implement basic security measures, Defendant has not only failed to comply with the FTC guidelines but also risked the privacy and security of their consumer's information.  This failure represents a significant breach of trust and a violation of the legal standards set forth by the FTC for data protection.

**DEFENDANT FAILED TO COMPLY WITH INDUSTRY STANDARDS.**

75.    Cybersecurity experts consistently recognize healthcare providers as particularly vulnerable to cyberattacks, primarily due to the valuable nature of the Private Information they handle, including PHI and PII.

---

[29] FTC, *Privacy and Security Enforcement*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Mar. 21, 2022).

76.    Certain identified best practices should minimally be implemented by healthcare providers like the Defendant.  These practices include but are not limited to, educating all employees, enforcing strong passwords, applying multi-layer security measures (including firewalls, anti-virus, and anti-malware software), implementing encryption to render data unreadable without proper authorization, utilizing multi-factor authentication, regularly backing up data, and restricting employee access to sensitive data.

77.    Additional standard cybersecurity best practices within the healthcare industry encompass installing appropriate malware detection software, monitoring and limiting network ports, securing web browsers and email systems, configuring network infrastructure (like firewalls, switches, and routers), safeguarding physical security systems, and training staff on key cybersecurity aspects.

78.    On information and belief, Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness

79.     Given these frameworks represent the current and applicable industry standards, Defendant's failure to comply with at least one or all of these accepted standards significantly contributed to the occurrence of the Data Breach.  Their non-compliance created vulnerabilities that the threat actor exploited, leading to the compromise of sensitive patient data.

## DEFENDANT BREACHED THEIR DUTY OF CARE

80. Defendant breached their duties to Plaintiff and Class Members, displaying negligence and recklessness in their failure to adequately safeguard their computer systems and data. This includes, but is not limited to, the following negligent acts and omissions:

    a.  Neglecting to establish a robust data security system to minimize the risk of data breaches and cyber-attacks.

    b.  Inadequately securing the Private Information of patients and customers.

    c.  Neglecting to continuously monitor their data security systems for breaches.

    d.  Not verifying that vendors with access to their computer systems and data were implementing reasonable security measures.

    e.  Failing to adequately train employees in secure email handling and maintenance of Private Information

    f.  Not ensuring the confidentiality and integrity of electronic Protected Health Information (PHI), in contravention of 45 C.F.R. § 164.306(a)(1).

    g.  Neglecting to implement technical policies and procedures to restrict access to electronic PHI to authorized persons or programs, violating 45 C.F.R. § 164.312(a)(1).

    h.  Failing to create policies and procedures to identify, prevent, contain, and address security violations, breaching 45 C.F.R. § 164.308(a)(1)(i).

    i.  Not regularly reviewing records of information system activity, such as audit logs, access reports, and security incident tracking reports, contradicting 45 C.F.R. § 164.308(a)(1)(ii)(D).

    j.  Failing to guard against foreseeable threats or hazards to the security or integrity of electronic PHI, in violation of 45 C.F.R. § 164.306(a)(2).

k.  Failing to prevent foreseeable unauthorized uses or disclosures of electronic PHI, in breach of 45 C.F.R. § 164.306(a)(3).

l.  Not ensuring their workforces comply with HIPAA security standard rules, contrary to 45 C.F.R. § 164.306(a)(4).

m.  Neglecting to effectively train all workforce members on PHI policies and procedures, as necessary for their roles and PHI security, infringing 45 C.F.R. § 164.530(b).

n.  Not rendering the electronic Private Information in their possession unreadable, unusable, or indecipherable to unauthorized persons, failing to encrypt the electronic PHI as specified in the HIPAA Security Rule (45 CFR § 164.304's definition of "encryption").

o.  Failing to adhere to FTC cybersecurity guidelines, in violation of Section 5 of the FTC Act.

p.  Not complying with established industry standards for cybersecurity.

q.  Breaching their duties and obligations in protecting Plaintiff's and Class Members' Private Information.

81.  Defendant negligently allowed cyberthieves to infiltrate their network and systems, which contained unsecured and unencrypted Private Information, thereby failing to safeguard Plaintiff's and Class Members' data.

82.  Consequently, Plaintiff and Class Members are now exposed to a heightened risk of fraud and identity theft.  Moreover, they have lost the benefits they were entitled to under their agreement with the Defendant.

## PLAINTIFF'S AND CLASS MEMBERS' DAMAGES

83.     Defendant knew or should have known both that medical information is incredibly valuable to threat actors and that health care data breaches are on the rise.  Accordingly, Defendant was on notice for the harms that could ensue if they failed to protect consumers' data.

84.     Due to the highly sensitive nature of the Private Information compromised in this Data Breach, Plaintiff and Class Members have incurred damages and are likely to endure further risks for an extended period, potentially for the rest of their lives.  To date, Defendant has not provided any compensation to Plaintiff or Class Members for the various harms already experienced.  Additionally, there is no evidence of any measures taken by Defendant to mitigate future harm to Plaintiff and Class Members arising from the Data Breach.

85.     The United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft face "substantial costs and time to repair the damage to their good name and credit record."[30]

86.     The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

---

[30] *See* U.S. Gov. Accounting Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), available at https://www.gao.gov/new.items/d07737.pdf.
[31] *See IdentityTheft.gov*, FEDERAL TRADE COMMISSION, https://www.identitytheft.gov/Steps (last visited Jan. 19 2023).

87.    The Private Information  exposed in the Data Breach is highly coveted and valuable on underground or black markets.  For example, identity thieves can use the stolen information to: (a) create fake credit cards that can be swiped and used to make purchases as if they were the real credit cards; (b) reproduce stolen debit cards and use them to withdraw cash from ATMs; (c) commit immigration fraud; (d) obtain a fraudulent driver's license or ID card in the victim's name; (e) obtain fraudulent government benefits; (f) file a fraudulent tax return using the victim's information; (g) commit medical and healthcare-related fraud; (h) access financial accounts and records; or (i) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.  Further, loss of private and personal health information can expose the victim to loss of reputation, loss of employment, blackmail, extortion, and other negative effects.

88.    While federal law generally limits an individual's liability for fraudulent credit card charges to $50, there are no such protections for a stolen medical identity.  According to a 2015 survey on medical identity theft conducted by the Ponemon Institute, victims of medical identity theft spent an average of $13,500 in out-of-pocket costs to resolve the crime.76 Frequently, this information was used to obtain medical services or treatments (59%), obtain prescription drugs (56%), or receive Medicare and Medicaid benefits (52%).  Only 14% of respondents said that the identity thieves used the information to obtain fraudulent credit accounts, indicating that medical information is a much more profitable market.[32]

89.    According to the Ponemon study, "[t]hose who have resolved the crime spent, on average, more than 200 hours on such activities as working with their insurer or healthcare provider to make sure their personal medical credentials are secured and can no longer be used by an

---

[32]    *Ponemon    Institute,    Fifth    Annual    Study    on    Medical    Identity    Theft*, https://static.nationwide.com/static/2014_Medical_ID_Theft_Study.pdf?r=65 (last visited Jan. 19, 2024).

imposter and verifying their personal health information, medical invoices and claims and electronic health records are accurate.[33]

90.    There may be a time lag between when harm occurs versus when it is discovered, and also between when Private Information is stolen and when it is used.  According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft.  Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years.  As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm[34]

91.    As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a.    losing the inherent value of their Personal Information;

b.    identity theft and fraud resulting from the theft of their Personal Information;

c.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d.    costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;

e.    unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their

---

[33] *See id.*
[34] *Report to Congressional Requesters*, GAO, at 29 (June 2007), available at: https://www.gao.gov/assets/gao-07-737.pdf (last visited Jan. 19, 2024)

accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

f.   lowered credit scores resulting from credit inquiries following fraudulent activities;

g.   costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts; and

h.   the continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their Personal Information being in the possession of one or many unauthorized third parties.

92.   Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

93.   Plaintiff and Class Members place significant value in data security.  According to a recent survey conducted by cyber-security company FireEye, approximately 50% of consumers consider data security to be a main or important consideration when making purchasing decisions and nearly the same percentage would be willing to pay more in order to work with a provider that has better data security.  Likewise, 70% of consumers would provide less personal information to organizations that suffered a data breach.[35]

---

[35]   FireEye, *Beyond the Bottom Line: The Real Cost of Data Breaches* (May 2016), https://www.fireeye.co/blog/executive-perspective/2016/05/beyond_the_bottomli.html (last visited Jan. 19, 2022).

94.     Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not.  Indeed, if consumers did not value their data security and privacy, Defendant would have no reason to tout their data security efforts to their actual and potential customers.

95.     Consequently, had consumers known the truth about Defendant's data security practices—that they did not adequately protect and store their Personal Information—they would not have entrusted their Personal Information to Defendant.

96.     Since being notified of the Data Breach, Plaintiff has spent time dealing with the impact of the Data Breach, valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation.

97.     As a result of the Data Breach, Plaintiff expects to continually invest significant time and resources in efforts to mitigate and manage the resulting damages.  These efforts will involve updating passwords, canceling credit and debit cards, and vigilantly monitoring accounts for any signs of unauthorized or fraudulent activities.

98.     Plaintiff's and Class Members' Private Information was compromised as a direct and proximate result of the Data Breach.

99.     As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

## **CLASS ACTION ALLEGATIONS**

100.    Pursuant to Fed.  R. Civ. P. 23(b)(3), Plaintiff brings this action against Defendant individually and on behalf of all other persons similarly situated (the "Class").

101.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

**All natural persons residing in the United States whose Personal Information was compromised in the Data Breach**

102.    Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant have a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant.  Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

103.    **Numerosity.  Federal Rule of Civil Procedure 23(a)(1).**  The members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable.[36]

104.    **Commonality.  Fed.  R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirement, this action involves common questions of law and fact that predominate over any HeathEC affecting individual Class Members.   The common questions include:

      a.   Whether Defendant owed a duty to Plaintiff and Class Members to safeguard their Private Information;

      b.   Whether Defendant owed a duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members.

      c.   Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiff's and Class Members' Private Information.

---

[36] .S.    Department    of    Health and    Human Services,    Currently    Under Investigation, https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf (last visited Jan. 11, 2024).

d.  Whether Defendant was negligent in maintaining, protecting, and securing Private Information.

e.  Whether Defendant were negligent in failing to adequately monitor and audit the data security systems

f.  Whether Defendant breached their duty to Plaintiff and Class Members to safeguard their Private Information

g.  Whether Defendant failed to notify Plaintiff and Class Members as soon as practicable and without delay after the data breach was discovered;

h.  Whether Defendant failed to take reasonable and prudent security measures;

i.  Whether Defendant's security measures to protect its systems were reasonable in light known legal requirements;

j.  Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards.

k.  Whether Defendant knew or should have known that their data security systems and monitoring processes were deficient

l.  Which security procedures and notification procedures Defendant should be required to implement

m.  Whether Defendant were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiff and Class Members;

n.  Whether Defendant violated state consumer protection and state medical information privacy laws in connection with the actions described herein

    o.   Whether Defendant's conduct, including their failure to act, resulted in or was the proximate cause of the Data Breach and/or loss of Private Information of Plaintiff and Class Member

    p.   Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect their Personal Information; and,

    q.   Whether Plaintiff and Class Members are entitled to damages, civil penalties, punitive damages, treble damages, and/or injunctive relief.

105.    **Typicality.  Fed.  R.  Civ. P. 23(a)(3)**.  Consistent with Rule 23(a)(3), Plaintiff' claims are typical of those of other Class Members.  Plaintiff' Personal Information was in Defendant's possession at the time of the Data Breach and was compromised as a result of the Data Breach.  Plaintiff' damages and injuries are akin to other Class Members and Plaintiff seek relief consistent with the relief of the Class.

106.    **Adequacy.  Fed.  R.  Civ. P. 23(a)(4).**  Consistent with Rule 23(a)(4), Plaintiff are adequate representatives of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class.  Plaintiff  has no conflicts of interest with the Class.  Plaintiff's Counsel is competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation.  Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

107.    **Predominance & Superiority.  Fed.  R.  Civ. P. 23(b)(3).**  Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  Common issues in this litigation also predominate over

individual issues because those issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues.  The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual Plaintiff may not be sufficient to justify individual litigation.  Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable.  Individual litigation by each Class Member would also strain the court system.  Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

108.    **Risk of Prosecuting Separate Actions**.  This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct for Defendant or would be dispositive of the interests of members of the proposed Class.

109.    **Ascertainability.**  The Class and Subclasses are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within the class.  Defendant has access to Class Members' names and addresses affected by the Data Breach.

## CLAIMS FOR RELIEF

### COUNT 1
### NEGLIGENCE
(On Behalf of Plaintiff and the Class)

31

110. Plaintiff re-alleges and incorporates by reference the substantive paragraphs above as if fully set forth herein.

111. 466. Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' Sensitive Information within their control from being compromised, lost, stolen, accessed and misused by unauthorized persons.

112. Defendant owed a duty of care to Plaintiff and Class Members to provide security, consistent with industry standards, to ensure that the systems and networks adequately protected the Private Information.

113. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and consumers, which is recognized by laws and regulations including but not limited to HIPAA, the FTC Act, and common law. Defendant were in a superior position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class Members from a data breach.

114. Defendant's duties also arose under HIPPA regulations, which, as described above, applied to Defendant and establish national standards for the protection of patient information, including protected health information, which required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1).

115. Defendant's duties also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable

32

measures to protect personal and Private Information.  Various FTC publications and data security breach orders further form the basis of Defendant's duty.  In addition, several individual states have enacted statutes based upon the FTC Act that also created a duty.

116.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above but also because Defendant is bound by industry standards to protect confidential Private Information.

117.    Defendant breached it duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Private Information

118.    Defendant breached their duties to Plaintiff and Class Members in numerous ways, including by:

> a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
>
> b. Failing to adequately monitor the security of its networks and systems;
>
> c. Failure to periodically ensure that its network system had plans in place to maintain reasonable data security safeguards;
>
> d. Failing to adequately train its employees to recognize and contain phishing attacks;
>
> e. Allowing unauthorized access to Class Members' Private Information;
>
> f. Failing to detect in a timely manner that Class Members' Private Information had been compromised;
>
> g. Failing to timely notify Class Members about the Data Breach regarding what type of Private Information had been compromised so that they could take

appropriate steps to mitigate the potential for identity theft and other damages; and

h.  Failing to have mitigation and back-up plans in place in the event of a cyber-attack and data breach.

119.  Plaintiff's and Class Members' Personal Information would not have been compromised but for Defendant's wrongful and negligent breach of their duties.

120.  Defendant's failure to take proper security measures to protect the sensitive Personal Information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of Plaintiff' and Class Members' Personal Information.

121.  It was also foreseeable that Defendant's failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff and Class Members as described in this Complaint.

122.  Plaintiff and Class Members do not have the ability to protect their Personal Information that was or remains in Defendant's possession.

123.  It was foreseeable that Defendant's failure to use reasonable measures to protect Plaintiff's and Class Members' Private Information would result in injury to Plaintiff and Class Members.  Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

124.  Neither Plaintiff nor the other Class Members contributed to the Data Breach and subsequent misuse of their Personal Information.

125.  The injury and harm Plaintiff and Class Members suffered was the reasonably foreseeable result of Defendant's breach of their duties.  Defendant knew or should have known that they were failing to meet their duties, and that Defendant's breach would cause Plaintiff and

Class Members to experience the foreseeable harms associated with the exposure of their Private Information.

126.    As a direct and proximate cause of Defendant's conduct, Plaintiff and Class Members suffered damages and will suffer damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the Personal Information of Plaintiff and Class Members; damages arising from identity theft or fraud; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, *inter alia*, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take years to discover and detect; and loss of the value of their privacy and confidentiality of the stolen confidential data, including health data.

## COUNT 2
## NEGLIGENCE *PER SE*
### (On Behalf of Plaintiff and the Class)

127.    Plaintiff re-alleges and incorporates by reference the substantive paragraphs above as if fully set forth herein.

128.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities, such as HealthEC, for failing to use reasonable measures to protect PII and PHI.  Various FTC publications and orders also form the basis of Defendant's duty.

129.    The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

130.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect Personal Information and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Personal Information it obtained, stored, and disseminated, and the foreseeable consequences of a data breach involving companies as large as Quest, including, specifically, the immense damages that would result to Plaintiff and Class Members.

131.    Defendant's violations of Section 5 of the FTC Act constitute negligence per se.

132.    Plaintiff and Class Members are within the class of persons that the FTC Act was intended to protect.

133.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and Class Members.

134.    Additionally, Defendant is covered by HIPAA (45 C.F.R. § 160.102) and as such are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

135.    HIPAA requires Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). HIPAA also requires Defendant to obtain satisfactory assurances that its business associates would appropriately safeguard the protected health information it receives or

36

creates on behalf of the Defendant.  45 CFR § 164.502(e), 164.504(e), 164.532(d) and (e). The confidential data at issue in this case constitutes "protected health information" within the meaning of HIPAA.  AMCA constitutes a "business associate" within the meaning of HIPAA.

136.    HIPAA further requires Defendant to disclose the unauthorized access and theft of the Personal Information to Plaintiff and Class Members "without unreasonable delay" so that Plaintiff and Class Members can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Personal Information.  See 45 C.F.R. §§ 164.404, 406, 410.

137.    Defendant violated HIPAA by failing to reasonably protect Plaintiff' and Class Members' Personal Information, as described herein.

138.    Defendant's violations of HIPAA constitute negligence per se.

139.    Plaintiff and Class Members are within the class of persons that HIPAA was intended to protect.

140.    The harm that occurred as a result of the Data Breach is the type of harm HIPAA was intended to guard against.

141.    As a direct and proximate result of Defendant's negligence per se under HIPAA and the FTC Act, Plaintiff and the Class have suffered, continue to suffer, and will suffer, injuries, damages, and harm as set forth herein.

**COUNT 4**
**BREACH OF IMPLIED CONTRACT**
(On Behalf of Plaintiff and the Class)

142.    Plaintiff re-alleges and incorporates by reference the substantive paragraphs above as if fully set forth herein.

143.     Defendant acquired, stored, and maintained Plaintiff's and Class Member's Private Information that they received either directly or from their healthcare providers.

144.     When Plaintiff and Class Members made payments and shared their Private Information with their doctors and/or healthcare providers, directly or indirectly, as part of transactions for goods or services, they effectively formed implied contracts.  These contracts were not just with their doctors and/or healthcare professionals but also extended to their business associates, revenue service providers, and other service providers, including Defendant.

145.     Plaintiff and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard and protect such information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

146.     As a prerequisite for receiving services from Defendant, Plaintiff and the Class had to provide their Private Information.  In return for these services, either Plaintiff and Class Members themselves or others on their behalf made monetary payments to Defendant.

147.     Defendant took custody of the Private Information belonging to Plaintiff and Class Members with the objective of delivering services to them and/or their medical practitioners.

148.     Alternatively, Plaintiff and Class Members were the intended beneficiaries of data protection agreements entered into between Defendant and healthcare providers.

149.     The implied promises include but are not limited to: (1) implementing measures to guarantee that any agents with access to Sensitive  Information also maintain its confidentiality; (2) ensuring that information accessed by their agents is confined and utilized solely for authorized medical purposes; (3) limiting access to only those agents who are qualified and adequately trained; (4) establishing and enforcing suitable policies for information retention to guard against criminal data breaches; (5) employing or mandating effective encryption; (6) requiring multifactor

authentication for accessing data; and (7) adopting additional precautions to safeguard against anticipated data breaches.

150.    Plaintiff and the Class Members would not have provided and entrusted their Sensitive Information to Defendant in the absence of the implied contract to keep the information secure.

151.    Plaintiff and the Class Members fully performed their obligations under the implied contract with Defendant by providing their Private Information, whereas Defendant did not comply with their obligations to keep the information secure.

152.    Defendant breached the implied contracts with Plaintiff and Class Members by failing to reasonably safeguard and protect Plaintiffs and Class Members' Private Information, which was compromised as a result of the Data Breach.

153.    As a direct and proximate result of Defendant's breach of their implied contacts with Plaintiff and Class Members, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) the loss of the opportunity as to how their Private Information is used; (ii) the compromise, publication, and/or theft of their Private Information; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their Private Information; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest and recover from tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) the continued risk to their Private Information, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate and adequate measures to protect

the Private Information in their continued possession; and, (vii) future costs in terms of time effort and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Member.

## COUNT 3
## UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

154.    Plaintiff re-alleges and incorporates by reference the substantive paragraphs above as if fully set forth herein.

155.    This count is plead in the alternative to the breach of contract count above.

156.    Defendant's business model has depended upon patients entrusting them with their Personal Information. Trust and confidence are critical and central to both the services provided by Defendant. However, Defendant's failed to ensure they reasonably or adequately secured, safeguarded, and otherwise protected Plaintiffs' and Class Members' Personal Information. Defendant's deficiencies described herein were contrary to their security messaging.

157.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they purchased goods and services from Defendant and/or its customers and in so doing provided Defendant with their Private Information. In exchange, Plaintiff and Class Members should have received from Defendant the goods and services that were the subject of the transaction and have their Private Information protected with adequate data security.

158.    Defendant was fully aware that Plaintiff and Class Members had conferred upon them valuable benefits, including Private Information and financial payments as part of receiving healthcare services. These benefits were knowingly accepted and appreciated by Defendant, who

subsequently profited from these transactions, utilizing Private Information for business objectives.

159.    Despite receiving these benefits, Defendant failed to secure Plaintiff's and Class Members' Private Information adequately, thereby not fulfilling their end of the implied agreement to provide robust data security.

160.    Defendant had within their exclusive knowledge at all relevant times the fact that they failed to implement adequate security measures to keep patients' Personal Information secure. This information was not available to Plaintiffs, Class Members, or the public at large.

161.    Defendant also knew that Plaintiffs and Class Members expected that their information would be kept secure against known security risks.

162.    Had Plaintiff and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Defendant.

163.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

164.    Plaintiff and Class Members have no adequate remedy at law.

165.    281.  As a direct and proximate result of Defendant's conduct, Plaintiff and

166.    Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs

associated with attempting to mitigate the actual consequences of the Data Breach; and (vii) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; an (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fail to undertake appropriate an adequate measures to protect the PII.

167.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.      That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiffs are proper class representatives; and appoint his Counsel as Class Counsel;

2.      For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Personal Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

3.      For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Private Information compromised during the Data Breach;

4.      That the Court award Plaintiff and Class Members compensatory, consequential, and general damages in an amount to be determined at trial;

5.     That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendant as a result of their unlawful acts, omissions, and practices;

6.     Ordering Defendant to pay for not less than five years of credit monitoring services for Plaintiff and the Class

7.     That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by law;

8.     That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

9.     That the Court award pre- and post-judgment interest at the maximum legal rate; and

10.     That the Court grant all such other relief as it deems just and proper

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all claims so triable.

Dated: January 22, 2024

/s/ *Christopher A. Seeger*
Christopher A. Seeger
Christopher L. Ayers
**SEEGER WEISS, LLP**
55 Challenger Rd., 6th Floor
Ridgefield Park, NJ 07660
(973) 639-9100